**MICHAEL H. SPORN**

ATTORNEY AT LAW
299 BROADWAY
NEW YORK, NEW YORK 10007

TELEPHONE
(212) 791-1200

mhsporn@gmail.com

FACSIMILE
(212) 791-3047

September 5, 2019

Hon. Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

                Re:  United States v. Jackie Cooper
                     Ind. No. 18 Cr 454 (KPF)

Dear Judge Failla:

      Jackie Cooper is the youngest of 12 siblings. He's 54 now. Four of his siblings have died. Five are retired. One is on disability in a nursing home. One drives a school bus in Orlando, Florida. They grew up in rural Florida in a place called Groveland about 40 miles west of Orlando. As the name implies, orange groves were the commercial lifeblood of the area.

      Mr. Cooper's father worked the orange groves. He was a crew chief. His crews pruned the orange trees and picked the fruit. Only it turned out that the "crew" doing the work consisted mostly of his wife and their children. Jackie does not have fond memories of his father. He was an alcoholic. He had cirrhosis of the liver which no doubt contributed to his demise. Jackie remembers that his father would disappear for days at a time, and take the money with him that his wife and children earned in the orchards. When his father was home, he was physically abusive to his wife and to his children. Jackie has vivid memories of one incident in particular. He was about 6 years of age. He was climbing a tree. Apparently he should not have been. His father whipped him with a vehicle fan belt. He spent a few days in the hospital and could not go to school for two weeks. His father died when Jackie was approximately 7 years old. By that point there were only 3 other siblings still at home.

      After his father died, his mother continued to work in the orchards with her children. When Jackie turned 15, he got a job at a gas station to earn a little extra money. When he was 18, he moved away. He had little or no adult guidance, support or supervision. His mother did the best she could but it was all she could do to feed and shelter her children. Soon enough Jackie was in and out of trouble with the law for mostly, but not always, minor offenses. The back story to my client's troubles with the law is a familiar one. From an early age, the meaningful story of Jackie Cooper's life has been one of alcohol and substance abuse. It was a form of a coping mechanism with a hardscrabble life he has known from the age of cognition to the present.

Hon. Katherine Polk Failla
September 5, 2019
Page - 2 -

    His life is etched in the lines on his face. He looks much older than he is. And in the long list of ailments that must be the inevitable result of a life lived in the margins. He has heart disease. He is diabetic. He is asthmatic. His legs are swollen and painful. He reports that he suffers from a condition known as RSD or reflex sympathetic dystrophy. Symptoms include swelling of the extremities. Causes include irritation of nervous tissue and heart disease. He reports that before he was arrested last July, he was taking water pills to help reduce the swelling. He cannot wear shoes because of the swelling in his feet. Instead he wears BOP slippers that are too large for him. He moves with difficulty, shuffling more than walking, projecting the appearance of an older man broken in spirit and in body. He also takes medicine for high blood pressure, for high cholesterol, for diabetes and for asthma as needed.

    He has what he described as "lazy eye," a condition he's had since childhood, and other vision issues requiring prescription eyeglasses. He was not allowed to take his into the Bureau of Prisons. He was told it would take 6 weeks for BOP to get new ones. He got them 8 months later. He has gained about 100 pounds since his remand which he attributes to the carbohydrate-heavy diet in the MDC. The extra weight is dangerously unhealthy for a middle-aged man with coronary disease, high cholesterol and diabetes. He also has coped with depression, was followed by a therapist and a psychiatrist who prescribed antidepressants.

    He has lived in shelters and in low-rent rooms. For the last two years (prior to arrest) he and Sharon Hatcher have shared a small, inexpensive first floor, or basement apartment in a poor neighborhood in the Bronx. They have been together now for approximately 12 years, and despite their myriad difficulties, including those with the law, they are devoted to each other. Unfortunately they also are both very much addicted to consuming crack cocaine. No doubt their substance abuse compounds all their other problems, rather than escaping them. Jackie is known throughout their building because every day he starts at the top floor and works his way down collecting empty bottles and cans in a shopping cart. He says he earns about $35 a day. The neighbors save their empties for him.

    He also did errands for the mother of one of the co-defendants in this case. Through her he met the co-defendant. Before long Jackie was doing errands for him also. He would bring the co-defendant money from street sales. He would take product belonging to the codefendant to others who made small street-level sales and he would less occasionally make some small, street-level sales himself. And by doing these things he was able to provide himself with crack for his own personal use. That was his only purpose in doing these things.

    No doubt my client was willingly exploited for the benefits conferred on him. Going forward, he will have to cope with the temptation of substance abuse. That has been a lifelong struggle. But he hardly fits the profile of the drug kingpin or mid-level trafficker targeted by Congress. He needs peace and quiet, safety and stability in his life. The concept of punishment as applied to this defendant is counterproductive.

His north star has been his 12-year old daughter, Tyesha. He follows her daily. They write, and they frequently talk on the telephone. He speaks with a father's pride in his voice when discussing her academic achievements. She just started 8th grade. They both have college aspirations for her. Jackie's oldest brother Tommy Dykes has been something of a father-figure. He is a retired state worker with a pension and lives in Waterbury, Connecticut. He is the legal guardian of Tyesha. When Jackie is released, he hopes to coordinate with his brother with a view toward getting out of the city and settling in Connecticut to be with Tyesha. He also will need the support of social security. My client has not been able to hold a full-time job in roughly a decade primarily because of the swelling in his leg. He cannot stand for extended periods. Before his arrest he was receiving disability resulting from his health issues. He will have to engage with social security again to resume that support.

The plea agreement stipulates the sentencing guidelines range of 46 to 57 months. The Pre-Sentence Report (PSR) reaches the same conclusion. Of course the guidelines range is no longer binding on the courts. *Kimbrough* makes clear that *all* Guidelines are advisory only. *See United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010). Instead courts now take into consideration all the sentencing factors outlined in 18 U.S.C. §3553(a) in crafting a reasonable sentence that is sufficient but not more than necessary. The advisory guidelines range is but one of those factors.[1] It is not entitled to any greater weight than the other factors. Although it may be a point of departure,[2] we do not start out with a "thumb on the [Guidelines] scale."[3] It is not entitled to a presumption of reasonableness.[4] And the converse is true as well: a non-guidelines sentence is not regarded as presumptively unreasonable.[5] When the guidelines are pegged to quantity as they are for narcotics offenses, they often can lead to unreasonable results that are odds with the underlying intent of Congress to deal with kingpins or middle managers.[6]

Above all, courts ultimately have come to recognize that, despite the guidelines era efforts to achieve consistency, sentencing is, as it must be, an "individualized assessment," *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); see also *Koon v. United States*, 518 U.S. 81, 98 (1996) ( "[E]very convicted person [must be considered] as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."); *United States v. Cavera*, 550 F.3d 180, 197 (2d Cir. 2008).

The §3553(a)(1) factors must focus on both "the nature and circumstances of the offense and the history and characteristics of the defendant." In Mr. Cooper's case these factors are inextricably intertwined. It is impossible to separate the offense from the offender here.

---

[1] See *United States v. Booker*, 543 U.S. 220 (2005).
[2] See *United States v. Fernandez*, 443 F.3d 19, 28 (2nd Cir. 2006).
[3] See *Kimbrough v, United States*, 552 U.S. 87, 113 (2007) (Scalia, J., concurring).
[4] See *Gall v. United States*, 552 U.S. 38, 50 (2007); *Rita v. United States*, 551, U.S. 338 (2007; *Nelson v. United States*, 129 S.Ct. 890, 892 (2009).
[5] See *United States v. Cavera*, 550 F.3d 180, 190 (2008).
[6] See *United States v. Dossie*, 851 F.Supp.2d 478 (E.D.N.Y. 2012).

The Hon. Katherine Polk Failla
September 5, 2019
Page - 4 -

amount of crack that my client actually played a role in selling is unknown, but by any measure could not have been more than a tiny fraction of the stipulated amount. The stipulation between the parties of between 28 and 112 grams includes what the other co-defendant was responsible for that was reasonably foreseeable to the defendant. As noted the drug guidelines are quantity driven. If followed, the defendant would be sentenced principally based on what somewhat else sold. That is why the drug guidelines in particular can be a poor proxy for determining a sentence sufficient but not greater than necessary.

Mr. Cooper respectfully suggests a sentence no more than 24 months is sufficient to vindicate the public policy purposes of sentencing articulated in 18 U.S.C. §3553(a)(2). The public policy purposes in the sentencing statute, at §3553(a)(2), to impose a punishment that is "sufficient but not greater than necessary" would be satisfied by a sentence of 24 months, or less. It would be a reasonable,[7] yet still significant, sentence. It would reflect the seriousness of the offense. It would be a just punishment in proportion to Mr. Cooper's narrow role, and in proportion to his background of substance abuse that accounts for his participation in this offense as well as so much of his criminal history.

The PSR justification for its recommendation of a 46-month sentence is "to punish the defendant for his involvement in this conspiracy."[8] Given Mr. Cooper's role here as a serial substance abuser, punishment for its own sake misses the mark. This justification ignores the overwhelming empirical evidence and research in the academic literature that has been recognized by prominent jurists and public officials in cases and commentary. Among others, Justice Kennedy recently observed in testimony before Congress that "this idea of total incarceration just isn't working, and it's not humane," and the former Attorney General of the United States, as reported in the New York Times, stated that "too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason." Lengthy sentences for low-level offenders do not work. As a former police chief, and current mayor of San Francisco, recently noted, "(L)aw enforcement has been on an incarceration binge for 30 years, and it hasn't worked." For non-violent offenders with substance abuse problems "incarceration doesn't fix the problem."[9]

In the career offender context, the Sentencing Commission itself has acknowledged that when career offender status is based on relatively minor drug offenses, the guidelines may create a sentence greater than necessary.[10] Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes, low-level drug sellers are readily replaced.[11] In

---

[7] See *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) (rule of reasonableness guides sentencing practices).

[8] See PSR at page 21.

[9] See New York Times, "California Voters to Decide on Sending Fewer Criminals to Prison" at page A14, October 6, 2014.

[10] See U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing, An Assessment of How Well The Criminal Justice System is achieving the Goals of Sentencing Reform 134 (2004).

[11] *Id.*

addition the Commission has observed a disproportionate impact on African-Americans because of the ease of detecting drug offenses occurring in settings found in impoverished minority neighborhoods.[12] There is a groundswell of recognition in the press, in the courts and in the academic literature that a generation of African- American men are being disappeared. In *United States v Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) Judge Weinstein observed that "[e]xcessive incarceration has disproportionately affected African Americans." *Id.* at 651.

Although individual and general deterrence are codified policy objectives, there is simply "no conclusive evidence that supports the hypothesis that harsher sentences reduce crime through the mechanism of general deterrence."[13] Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[14] In fact, "[t]hree National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence."[15] The Report from the Sentencing Commission itself confirms that the empirical evidence shows "[r]ecidivism rates decline relatively consistently as age increases."[16] This has particular significance here. At 54 years of age, as my client struggles to come to grips with addictive behavior, it does not follow that he resorts to the life of a trafficker. He is aging out of the sales side of drug use.

Another objective of sentencing is to "promote respect for the law."[17] But unduly harsh sentences breed disrespect for the law. "A sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 55 (2007). *See also United States v. Deegan*, 605 F.3d 625, 655 (Bright, J., dissenting) (harsh federal punishment compared to lenient state sentencing for the same criminal activity "promotes disrespect for the law and the judicial system."); *United States v. Stern*, 590 F. Supp.2d 945, 957 (N.D. Ohio 2008) ("Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake."); *United States v. Ontiveros*, 07 Crim. 233, 2008 WL 2937539, at *3 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law].").

---

[12] *Id.*

[13] *See* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003).

[14] *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

[15] *Id. See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007)("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

[16] *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[17] *See* 18 U.S.C. §3553(a)(2)(A).

Jackie Cooper has been in custody since July 25, 2018 – a period of over 13 months as of the anticipated September 12 sentencing date. In general, the harsh conditions at pretrial facilities such as lack of ample programming, limited family visits and lack of exposure to sunlight and the outside are well known to the courts.[18] Even before *Booker*, courts have held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure."[19] My client was in the MDC last winter when the facility lost heat and power. During a bitterly cold stretch of winter, he was without heat, in the dark and cut off from the outside world for an extended period of time. It was a terrifying and for him a physically challenging experience. Throughout his pretrial detention, he has not been provided with the same medicine, or nearly the same dosage for meds he is getting. The level of medical attention in the MDC is notoriously poor, and my client has been no exception. His confinement under difficult conditions is a factor to be weighted in the equation with or without a formal departure

Jackie Cooper has not led a model life. He cannot erase the past or his mistakes in it. He is not asking for his crime in this case to be forgiven or forgotten. Instead he is asking not to be consigned to the garbage heap; not to be warehoused. He is a human being of value. He knows there must be consequences for violating the law. He asks only for a reasonable punishment. We respectfully ask your Honor to take all these factors into account in fashioning a sentence that reflects compassion, fairness and justice.

Respectfully submitted,

Michael H. Sporn

MHS/ss
Cc: Sarah Krissoff, Esq.

---

[18] *See, e.g. Bell v. Wolfish*, 441 U.S. 520 (1979); *United States v. Gallo*, 653 F.Supp.320, 336 (E.D.N.Y. 1986).

[19] *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States v. Farouil*, 124 F.3f 838, 847 (7th Cir. 1997)(harsh conditions of confinement are valid grounds for departure)..