K4L9WALC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                              18 CR 454 (KPF)
                                      Remote Telephone Conference

ALLEN WALKER,

              Defendant.

------------------------------x

                                           New York, N.Y.
                                           April 21, 2020
                                           11:14 a.m.

Before:

              HON. KATHERINE POLK FAILLA,

                                           District Judge

                     APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
FRANK J. BALSAMELLO
     Assistant United States Attorney

MAHER & PITTELL
     Attorney for Defendant
BY:  JEFFREY G. PITTELL

ALSO PRESENT:  KEYANA POMPEY, Pretrial Services

1             (The Court and all parties appearing telephonically)
2             (Case called)
3             MR. BALSAMELLO:  Good morning, your Honor.  Frank
4    Balsamello for the United States.
5             THE COURT:  Good morning, sir.
6             MR. PITTELL:  Good morning, your Honor.  It's Jeffrey
7    Pittell appearing for Mr. Walker.
8             THE COURT:  Good morning to you as well.  Is there
9    someone on the line representing the pretrial services office?
10            MS. POMPEY:  Good morning, your Honor.  Keyana Pompey
11   appearing for pretrial services.
12            THE COURT:  Thank you very much.
13            And I believe, as well, we have a court reporter on
14   the line.
15            Because of that, I would ask the parties to please be
16   careful when they're speaking not to speak over someone else
17   and if you are -- if it's not obvious who you are, for example
18   if you're not responding to a question that I've specifically
19   asked you to answer, could you please announce who you are so
20   that the court reporter is aware.
21            And I would invite the court reporter, who is here
22   with my deepest thanks, to let us know if there are any
23   problems hearing what's going on.
24            Mr. Pittell, this is a conference that I convened in
25   response to an emergency bail application on behalf of your

client, Allen Walker. Arguably, it is a legal conference under Federal Rule of Criminal Procedure 43 but arguably, as well, it could be perceived as a detention hearing that under the CARES Act I am able to conduct telephonically if the client, Mr. Walker in this case, is aware of and consents to not appearing on the call.

Could you please let me know, could you please place on the record the communications that you've had with Mr. Walker regarding the rights that he has and his ability to waive those rights.

MR. PITTELL: This is Jeffrey Pittell. Sure.

I spoke with Mr. Walker yesterday, explained the rights that you just mentioned to him, and he told me that he will consent to my waiving his appearance on this phonecall.

THE COURT: All right. Thank you.

And prior to the call yesterday have you had other discussions with him -- I don't want to know the privileged communication, sir -- but other discussions where you've suggested to him that he may need to waive his presence or may be given the opportunity to waive his presence in order to have a call take place more quickly?

MR. PITTELL: I have not had any direct discussions with him on that but as I alluded to in some of my correspondence, I've spoken with family members who were able to speak with him and I asked them to tell him to call me and

1  to explain to him that I had this bail hearing pending and that
2  I need to speak with him in order to waive his appearance.
3           THE COURT:  OK.  Fair enough.  And I should have begun
4  the conference --
5           MR. PITTELL:  I'm sorry.
6           THE COURT:  Go ahead, please.
7           MR. PITTELL:  And so I should also just add that in
8  general the response of the family was that he wanted to go
9  forward with the bail hearing and then to be released on bail.
10 So I can infer that he would have been willing to -- for me to
11 waive his appearance had I not been able to speak with him
12 yesterday.
13          THE COURT:  OK.  But then you were able to speak with
14 him so we have something more direct.  Thank you.
15          What I had meant to begin by saying was I do hope that
16 everyone participating in this call is well and that the same
17 can be said for your families and loved ones and clients.
18          Mr. Pittell, what I understand is that there was some
19 discussion with the government about reaching agreement as to a
20 set of conditions on which Mr. Walker could be released but
21 those discussions have broken down.
22          Is that fair to say, sir?
23          MR. PITTELL:  I don't -- this is Jeff Pittell again
24 speaking.  I don't know if I want to call it broken down.  I
25 think there is just maybe one general condition regarding the

third party custodian and the no-visitor requirement in the government's proposed order that I'm having difficulty finding a suretor that will comply with that, and that's -- so to the extent there's a breakdown, I think it's just my inability to specifically meet the condition as worded in the government's proposed order.

THE COURT:  And I want to be clear.  You and the government can have the agreements that you have.  That doesn't necessarily mean that I would accept it.

I've been reviewing the presentence investigation report which I had because this case was so close to sentencing.  There are names that have been proposed to me in your correspondence as potential suretors or cosigners, either folks with moral suasion or folks who are financially responsible parties.  But there are some folks whose names I haven't heard and I wanted to know if they had a position.

Mr. Pittell, there is a woman named Darlene White whom Mr. Walker refers to as his best friend.  She is employed as a nurse.  Is she unable or able to sign a bond on his behalf?

MR. PITTELL:  I spoke with her.  The problem was that she is unable to have him in her residence.  There's just too many people there.  If you give me a moment I can just review my notes regarding her.  Because I spoke with her and -- she's not a possibility that's why I'm -- (pause) I spoke with her and in searching for a place for him to live and that just

1    wasn't a possibility.

2            THE COURT:  Even if for any number of reasons
3    Ms. White was unable to have Mr. Walker live with her, is she
4    willing to sign a bond as a financially responsible person?

5            MR. PITTELL:  That I don't know.

6            THE COURT:  OK.  There is also another, mother of his
7    child, Shantin, and I should really spell that correctly,
8    excuse me.  It is S-H-A-N-T-I-N Pineago, best guess on how to
9    pronounce it, P-I-N-E-A-G-O who is a security guard.

10           Is Ms. Pineago available either as a potential
11   provider of residence or as a potential cosigner on the bond?

12           MR. PITTELL:  I haven't spoken with her throughout the
13   pendency of this case.  I've had contact with all the people
14   who I have referenced in the letters as well as Ms. White and
15   I've never spoken with her and Mr. Walker -- in fact, I think
16   the first I heard of her was during the presentence interview.
17   So I have not reached out to her.

18           THE COURT:  OK.  And then there's a reference to -- I
19   believe this is Mr. Walker's cousin, Joelle Dixon, who is one
20   of the residents, I think, in his aunt's apartment here in the
21   New York area.  Mr. Dixon is listed -- I believe he's a
22   Mr. Dixon.  He's 20 years old.  Does he work outside the home?

23           MR. PITTELL:  Yes.  I believe that's one of
24   Ms. Doxen's sons and I inquired about having both of them sign.
25   Neither of them are willing to sign.

1            THE COURT:  I'm sorry.  He's not willing to sign.  OK.
2            MR. PITTELL:  No.
3            THE COURT:  So then let me -- that actually leads
4    right into the concern that I have.  We have a couple of
5    different issues here and one is, of course, finding a
6    residence that would be safer than the situation that
7    Mr. Walker currently has and a second concern that I have is
8    finding folks who are known to Mr. Walker and trust him enough
9    that they're willing to sign a bond for his release.
10           It is of concern to me that Ms. Doxen, excuse me that
11   I said her name incorrectly, Donna Doxen, who is the maternal
12   aunt, and her son are unwilling to sign because right now the
13   folks who are, are Ms. Francine Doxen, Mr. Walker's mother, who
14   would only be available for moral suasion, and Ms. Williams,
15   the one financially responsible person.  And it is also of
16   concern to me that the mother of two of Mr. Walker's children,
17   that is Ms. Stephanie Twilley T-W-I-L-L-E-Y is willing to let
18   him live in her home but unwilling to let him sign a bond.
19           I guess what I'm saying, Mr. Pittell, in a bit of a
20   circuitous manner, is I don't feel that there are enough folks
21   who are willing to be cosigners to give me comfort that
22   Mr. Walker will remain in place and not commit any crimes and
23   not flee in advance of sentencing.  So what can be done to give
24   me the confidence that I need?
25           MR. PITTELL:  Well, I could go back and speak with

1  Ms. White.  I could go back and speak with people who I have
2  not spoken with.  I could speak with his mother and tell her
3  that we need more people.  I could do the same with
4  Ms. Williams.  And that's really it.
5          I mean I understand why Ms. Twilley is unwilling to
6  sign the bond.  Her unwillingness to sign the bond is not
7  because she thinks he's going to flee.  It's just from her
8  perspective is their relationship ended a long time ago.  He
9  is, though, the father of their children.  She does not want to
10 see harm come to him.  She's willing to take him into her
11 apartment, which is an imposition on her current state of life
12 because it's a one-bedroom apartment in the Bronx and it is
13 shared by three people and so now there would be a fourth
14 person in there, and he owes her child support and there's a
15 judgment and she just doesn't want to do anything that could
16 potentially put her in a dire financial circumstance.  I can
17 understand that.  So I don't think it's her reason not to flee.
18         As far as the two sons of Ms. Doxen, who are both
19 actually working for delivery services so they're actually both
20 very busy.  They both don't have a -- much of a rapport with
21 Mr. Walker.  I think one is ten years younger and I think
22 another may even be twenty years younger.  So even though
23 they're first cousins, I don't think they had much interaction
24 growing up with each other so I don't know how close they are
25 in terms of a relationship.  So that is the reason why I was

K4L9WALC

told that they were unwilling to sign the bond.  I can keep looking.

In terms of the residence, I can at least update from my correspondence is both his mother and Ms. Williams are willing to take him into their houses in Georgia which, while I'm a little concerned about the distance, but putting that aside for the moment, I think from a safety perspective that's the best situation because they are houses as opposed to relatively small size New York City apartments so he can be quarantined when he gets there and he's not going to be on top of the other people that are living there.

I can arrange to have -- Ms. Doxen told me that her son will drive there, drive to New York, and wait for Mr. Walker at MCC.

THE COURT:  One moment, please, sir.  The Ms. Doxen of whom you are now speaking, is that Mr. Walker's mother or his aunt?

MR. PITTELL:  His mother, Ms. Doxen.

THE COURT:  Thank you.

MR. PITTELL:  Look, I realize you have not granted bond yet.

THE COURT:  On this record I'm not going to so I just want to be clear about that.  But go on.  Keep going.

MR. PITTELL:  At least in terms -- I just wanted to inform you of the logistics of how I could get him to Georgia

1   would be to have somebody waiting for him at MCC with a car and
2   drive him right to Georgia.  I think it's preferable doing it
3   that way as opposed to trying to figure out how to get him to
4   the Port Authority and him going on a bus or somehow getting to
5   an airport and taking a flight.  I don't know if there's trains
6   to where they are in Georgia but, if there was, getting to Penn
7   Station and taking a train.  So that's what I would do as far
8   as that.
9           I understand your concerns about sureties and I will
10  continue to look and what I'll do is once I have more concrete
11  information, file a letter to the Court or request a subsequent
12  conference, whatever is more preferable.
13          THE COURT:  OK.  Let me please speak with the pretrial
14  services officer.  Ms. Pompey, you remain on the line?
15          MS. POMPEY:  Your Honor, I'm here.
16          THE COURT:  Thank you very much.
17          Ms. Pompey, I'm going to wait and see what Mr. Pittell
18  is able to find out about additional suretors.  But in terms of
19  the logistics, you've just heard discussion about how a member
20  of the family might meet him -- him being Mr. Walker -- at the
21  MCC and drive him down to Georgia.
22          How, if at all, would the pretrial services office be
23  able to monitor Mr. Walker while he was in transit and once he
24  arrived at -- in Georgia?
25          MS. POMPEY:  Yes, your Honor.  We would place location

1   monitoring device on Mr. Walker, which preferably will be a GPS
2   unit considering the travel circumstance, at least until he
3   arrived to Georgia and have the office there decide whether
4   that GPS unit should remain on him or be switched out,
5   considering he will be on home incarceration.  So with no
6   movement, there would probably be no reason for a GPS.  But we
7   are able to connect a device for transit.
8            THE COURT:  In this pandemic era, will you have the
9   ability to obtain a courtesy supervision from pretrial services
10  offices in Georgia near the residence?
11           MS. POMPEY:  We would absolutely make a courtesy
12  request.  I have not had the opportunity to see how that
13  district is going about a courtesy request or location
14  monitoring cases but we would make a request if your Honor
15  decided to release the defendant.
16           THE COURT:  OK.  From the perspective of pretrial
17  services, is it preferable to have Mr. Walker in the New York
18  area or in the Georgia area?
19           I think you've heard from Mr. Pittell the pros and
20  cons of each that New York is obviously closer than Georgia but
21  Georgia provides a separate bedroom rather than a shared
22  apartment.
23           MS. POMPEY:  Yes.  Pretrial would prefer for the
24  defendant to stay in the New York area, especially considering
25  his history, it is not an ideal situation to send him to

1   Georgia, but -- we leave it up to the Court.

2   THE COURT:  I didn't want to cut you off.  Excuse me.

3   Mr. Balsamello, I appreciate your patience on this
4   call.  I think you're understanding from the questions that I'm
5   asking that I'm not satisfied with the current surety packages
6   that have actually been proposed by either side.

7   I don't know that I know your office's position on the
8   possibility of Mr. Walker residing in Georgia.  I do think I
9   understood that you were opposed to his residing with his aunt
10  because of the two sons who were not in a position, it would
11  seem, to social distance and to not bring friends to the house.
12  And I believe, as well, that you were concerned about
13  Ms. Twilley as a potential place of residence because of her
14  unwillingness to sign the bond.

15  What is the government's view about the possibility of
16  Mr. Walker residing in Georgia?

17  MR. BALSAMELLO:  Your Honor, I think that if pretrial
18  services is comfortable with the degree of monitoring that can
19  be done down there and that the conditions can otherwise be met
20  and that his mother can assure a quarantined home and check-ins
21  as pretrial requires, as the Court directs and all of the other
22  things that would give everyone comfort that he was in that
23  specific location such that when this ends we know where he is
24  and will be sure that he returns.  I think it is far from ideal
25  but if the monitoring, the electronic monitoring is in place,

1    the check-ins are in place, I think it could be satisfactory.

2              Obviously, this all comes against the backdrop of
3    someone with his criminal history who was a fugitive in this
4    case for ten months.  As your Honor saw, the concern about
5    Ms. Twilley not signing the bond, she then would really have no
6    obligation to make sure he didn't leave that apartment or do
7    something else from that apartment.  And his aunt's apartment
8    is seemingly to be less safe or no safer than quarantining at
9    the MCC.  So among all these options, if monitoring can be done
10   appropriately from Atlanta, that seems like the best that's on
11   the table here.

12             THE COURT:  All right.  Let me then be clear to the
13   parties.  Looking at the PSR, looking at Mr. Walker's history,
14   his criminal history, looking at the fact that he was on the
15   run for ten months in this case, the packages that the parties
16   have suggested to me are, in my estimation, insufficient to
17   give me comfort.  And so I believe, I think that Mr. Walker
18   should be providing at least three financially responsible
19   parties and he can have all the moral suasion that he wants.
20   That's fine too.  But I would want three financially
21   responsible parties and much more comfort and understanding
22   about the residence in Georgia before I would let him go there.
23   Certainly if Ms. Twilley was willing to let him be in her home
24   and was willing to sign the bond she could be moral suasion
25   but, again, if the route the people are thinking about is

K4L9WALC

1   residing with his mother in Georgia, there should be three
2   financially responsible persons in addition to the moral
3   suasion of Ms. Francine Doxen.
4           So with that, I'll let the parties go and tell me
5   whatever -- go out and find whatever they want to find and come
6   back to me. I'm obviously -- look, I'm in chambers a couple
7   days a week. I'm there today. I'll look at whatever you send
8   my way. But I don't have the confidence that I need for a
9   gentleman who is steps away from being sentenced and has a
10  sense of what the sentences are for the other defendants, I
11  don't have the comfort that I need.
12          With that, Mr. Balsamello, is there anything that you
13  want to bring to my attention in this conference that you have
14  not been able to do?
15          MR. BALSAMELLO: No, your Honor. Thank you.
16          THE COURT: Thank you.
17          Mr. Balsamello, I'm going to impose upon you to obtain
18  a transcript of this conference. Please give it to Mr. Pittell
19  when you receive it so that he may gave it to Mr. Walker
20  because of Mr. Walker's inability to attend.
21          MR. BALSAMELLO: I'll do that.
22          THE COURT: Thank you.
23          Mr. Pittell, is there anything else you'd like me to
24  know in this conference?
25          MR. PITTELL: No. Thank you.

K4L9WALC

1    THE COURT:  All right.  I thank you very much and I'll
2  hear from the parties when it is appropriate to do so.  For now
3  I'll ask those of you who are not my deputy or my law clerk to
4  disengage from the call with my thanks.  Thank you.
5    (Adjourned)